**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| Deborah S. Hunt<br>Clerk | 100 EAST FIFTH STREET, ROOM 540<br>POTTER STEWART U.S. COURTHOUSE<br>CINCINNATI, OHIO 45202-3988 | Tel. (513) 564-7000<br>www.ca6.uscourts.gov |

Filed: June 01, 2022

Mr. Craig L. Garrett
Craig L. Garrett, Attorney at Law
607 Smithview Drive
Maryville, TN 37803

Mr. Benjamin K. Lauderback
Mr. Daniel Roberts Pilkington
Watson, Roach, Batson Rowell & Lauderback
P.O. Box 131
Knoxville, TN 37901-0131

Mr. Gary M. Prince
Mr. Nathaniel Craig Strand
O'Neil, Parker & Williamson
7610 Gleason Drive, Suite 200
Knoxville, TN 37919

Mr. Jonathan Swann Taylor
Taylor & Knight
800 S. Gay Street, Suite 600
Knoxville, TN 37929

Re: Case No. 21-5863, *Theresa Hoogland v. City of Maryville, TN, et al*
Originating Case No. : 3:19-cv-00383

Dear Counsel,

The Court issued the enclosed opinion today in this case.

Enclosed are the court's unpublished opinion and judgment, entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Sincerely yours,

s/Laurie A Weitendorf
Opinions Deputy

cc: Ms. LeAnna Wilson

Enclosures

Mandate to issue

Case: 21-5863  Document: 32-1  Filed: 06/01/2022  Page: 2  (2 of 19)

NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0219n.06

No. 21-5863

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |
|---|---|
| THERESA HOOGLAND,<br><br>    Plaintiff-Appellant,<br><br>v.<br><br>CITY OF MARYVILLE, TENNESSEE, a governmental entity; MATTHEW WATSON, Individually; ELIZABETH RIFFLE, Individually; SCOTT SPICER, Individually; HAROLD WEEDEN, Individually; DARIN G. GALLOW, Individually; CHRISTOPHER J. PIERCE, Individually; DEPUTY JUSTIN BECKMAN, Individually; BLOUNT COUNTY, TENNESSEE, a governmental entity; JOHN AND JANE DOES, 1–10,<br><br>    Defendants-Appellees. | **FILED**<br>Jun 01, 2022<br>DEBORAH S. HUNT, Clerk<br><br>ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE<br><br>OPINION |

Before: SUTTON, Chief Judge; KETHLEDGE and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. This case concerns the constitutional rules that apply when officers believe a person is suicidal. After Theresa Hoogland disappeared, her daughter alerted the police that Hoogland was contemplating suicide and that Hoogland's gun was missing. When the police found Hoogland, they aggressively pulled her out of her car and forced her to a hospital. Hoogland now alleges that various officers used excessive force and unreasonably searched her in violation of the Fourth Amendment. She also seeks to hold officers liable for a "state-created danger" and for interfering with her relationship with her daughter in violation of substantive due process. All of these claims lack merit, so we affirm the judgment for the state defendants.

No. 21-5863, *Hoogland v. City of Maryville, Tenn., et al.*

I

Having suffered through an acrimonious divorce, Hoogland lived with her youngest (17-year-old) daughter in Maryville, Tennessee. On September 29, 2018, her daughter woke up on a typical Saturday morning. She had a band competition that afternoon and planned to fly to Colorado with her mom the next day to visit one of her sisters. Oddly, though, her mother was nowhere to be found. Hoogland had not talked to her daughter or left a note before leaving, had failed to respond to text messages, and had neatly laid out credit cards and cash on the kitchen counter. Compounding her daughter's concern, Hoogland had said the night before that she would not be making the trip to Colorado.

When trying to figure out where her mother had gone, Hoogland's daughter came across a troubling email that her mother had sent that morning to an unknown man, Victor Barr. The email expressed suicidal ideas, including that Hoogland had "loaded into a bag everything to exit 'life'" and that the bag contained an "Arsenal." Email, R.46-1, PageID 353. It stated in full:

> Thank you for looking in the parking lot. I was at the right one. Eventually I made it to bed after taking enough pills to escape. I woke up, loaded into a bag everything to exit "life" or stuff to use to go on. Can[']t decide. Want to leave so much. Trust me I've tried to stay for 8 years. I just drove 'nowhere' down a quiet road with Arsenal in the bag. Now just thinking about what to do with it, what's left of me and my four beautiful daughters who drank the poison spewed by their toxic emotionally abusive father. I drank the poison too. For over 15 yrs. My ex could be so kind and nice BUT total opposite. Everyone on the 'outside' thought he just about walked on water. If you read The Emotionally Abusive Relationship by Patricia Evans. You'll understand. Now, too often I see my beautiful daughter ages 17-23 walking on water in all public arenas. And sweet and nice at times with mom, but so very often…..too often. They have become like. "Dad". He's on the pedestal, which I helped erect. I'm in the "killing fields[.]" They have the AK 47's and I don't even have a f***ing bullet proof vest on. "Steve would pull his 47 out when least expected. 3 of 4 daughters are doing the same. We were to leave for a 'happy' CO 7 day vacation tomorrow to see daughter Amari at U of CO. I quietly texted them, I don't think I'll be going. I paid for tickets, accommodations, left charge card on counter for 17 yr old to buy everything all want or need. They are bewildered I gently text or said I'm staying behind. I tried desperately yesterday to find a PTSD therapist or trauma center to stay till girls return on oct. 7. Even drove

2

No. 21-5863, *Hoogland v. City of Maryville, Tenn., et al.*

> to a church, then decided person I was going to see wasn't safe. I have reasons for saying that. Saw him two days ago with troubled verbally abusive teen towards mom….."To die or not to die" that is the question, right now.
> Theresa.

*Id.*

After discovering this message, Hoogland's daughter called 911. She explained to the dispatcher that Hoogland might have a gun, was contemplating suicide, and had been suffering from major depression and anxiety. The daughter separately called her boyfriend, who came to her home with his parents.

A short time later, Officer Matthew Watson and Corporal Elizabeth Riffle with the Maryville Police Department arrived at the home. Hoogland's daughter repeatedly told the officers that she knew that her mother had a gun but that she had looked through the house and could not find it.

Watson and Riffle read Hoogland's email and likewise became concerned for her safety. They tried to track down Hoogland. Multiple calls went straight to voicemail. Multiple text messages went unanswered. The officers also received permission from Hoogland's daughter to walk through the home, but they located neither Hoogland nor a gun.

They eventually learned that the recipient of Hoogland's email, Barr, was a local therapist. He told Riffle that Hoogland had recently tried to schedule an appointment for her daughter but that he had never met them. Within the hour, Barr called Riffle back because he received a second email from Hoogland. This email continued the first email's suicidal tone but added concerning thoughts about her children. It spoke of a "lifeless body" and questioned whether her children could "dodge the can[n]on balls." Email, R.46-2, PageID 354. The email provided:

3

No. 21-5863, *Hoogland v. City of Maryville, Tenn., et al.*

> Dr. Barr,
>
> First I appreciate a response.
>
> You're a captain on a ship. It's 2:00 a.m. Your ship is shrouded in a cloak of blackness. In deep waters, smack dap in the middle of the Pacific Ocean. Menacing, murky, turbulent water storm's approaching…..and you suddenly see a lifeless body.
>
> Will you ask the 'body' if 'it's' Ok????
>
> Dr. The lifeless body in the foreboding, dark murky waters needs a "life preserver[.]"
>
> I know the alternative. You know the alternative.
>
> Right now the alternative will bring a quiet, peaceful, stop begging for oxygen, calm.....sooooo needed. The begging for miracles.
>
> But there's always consequences to every action in LIFE. Good and bad.
>
> And there's consequences in death. Not the going to Hell part. I don't believe that.
>
> It's the possible pain of those seeing the corpse, the corpse still, quiet, pale calm. Whether the corpse is visible or invisible.
>
> It would have been better had my mother died when we 'kids' were little. This not said in bitterness. Will never say with a regret. Never.
>
> It's the 'possible' pain of the onlookers, the beautiful daughters, the son, his little kids.
>
> A canon turned on them? They've been taught how to dodge bullets. They are fast runners. But, Can they dodge the canon balls? Maybe there will be no canon. Best case scenario.
>
> Hopefully.

*Id.*

After reading this second email, the officers' sense of urgency heightened. They now became concerned that Hoogland was not just suicidal but also homicidal. The mother of her daughter's boyfriend also privately told Riffle that Hoogland had "ongoing" problems, that she "mentally tortures" her daughter, that she had not allowed her daughter to attend school the past week, and that she was "crazy." Riffle Body Cam., R.51-7, 0:55:55–56:53.

The officers decided that they needed to forcibly admit Hoogland to a hospital. They arranged for a "ping" of her phone. It came back to a church's parking lot in Blount County,

4

No. 21-5863, *Hoogland v. City of Maryville, Tenn., et al.*

outside the city's jurisdiction. By this point, Sergeant Scott Spicer, Riffle and Watson's superior, had arrived. He ordered Watson to ask dispatch to send Blount County deputies to the church.

Four deputies with the Blount County Sheriff's Office went there: Corporal Darren Gallow and Deputies Justin Beckman, C.J. Pierce, and Harold Weeden. While the deputies were in route, Spicer warned Weeden to "use extreme caution," that "she's armed," that Hoogland has been sending "odd and strange emails," and that they believe "she's homicidal and suicidal." Watson Body Cam., R.51-8, 1:17:38–18:05. Riffle likewise filled in Gallow. She told him that Hoogland's gun was missing, that her emails were "suicidal," "twisted and warped," and that the deputies should "be careful." Riffle Body Cam., R.51-7, 1:13:12–33, 1:14:08–11.

The deputies spotted Hoogland in her car in the church's empty parking lot. They parked at locations hidden from her view. A church landscaper told them that Hoogland had been there for hours without moving. The deputies planned an approach of Hoogland's car from a concealed position to protect themselves. As some officers began to walk toward the car, though, Hoogland suddenly drove off. Concerned that she could harm herself or others, another officer conducted a traffic stop at an intersection next to the church.

The four deputies approached Hoogland's stopped car—three with rifles, the other with a handgun. Weeden Dash Cam., R.51-11, 0:13:34–50. While pointing their weapons at Hoogland, they repeatedly yelled for her to "put your hands up" (at least one deputy began to use profanity in this command). *Id.* Hoogland initially raised her hands but then began moving them up and down between the steering wheel and her lap.

When the deputies reached the car, Deputy Beckman grabbed Hoogland's arm through the open driver's window so that she could not reach for a gun. At the same time, she kept asking the officers: "Why are you screaming at me?" *Id.*, 0:13:52–14:03. Beckman next opened the door

5

and pulled Hoogland out with Weeden's help. They used force to control Hoogland, to push her against her car, and to pull her arms behind her back to handcuff her. As they handcuffed her, Hoogland shouted "ow, my arm, my f***ing arm, ow, ow, ow." *Id.*, 0:14:09–14. (Hoogland cites no evidence that she suffered any lasting injury from this encounter.)

Once the deputies safely secured a handcuffed Hoogland in the back of Deputy Weeden's police cruiser, some of them searched her car for a gun. They did not find one. Others questioned a generally hostile Hoogland in the cruiser. When a deputy asked her if she had threatened to shoot herself, Hoogland responded that she "didn't use the word 'shoot.'" *Id.*, 0:20:55–57. The deputy followed up about whether she wanted to hurt herself, and she noted that she had been "in debate about that[.]" *Id.*, 0:21:03–08. At one point, she also suggested that the handcuffs were too tight, but the deputy confirmed that he could get a finger between them and her wrist.

A deputy asked dispatch to send a female officer for a pat-down search. Corporal Riffle arrived to search Hoogland for the missing gun. Hoogland cursed at Riffle as she approached to conduct the search. Riffle explained the panic that Hoogland had caused due to "the emails that [she has] been sending." Riffle Body Cam., R.51-12, 0:01:07. Yet Hoogland continued to resist Riffle's attempt to conduct the search. She also demanded that the officers remove the handcuffs. Riffle again confirmed that the handcuffs were not too tight. After Riffle gained enough control of Hoogland, she patted Hoogland down but did not find a gun.

Deputy Weeden drove Hoogland to Blount Memorial Hospital. The hospital held Hoogland due to "suicidal ideation." Med. Rec., R.51-13, PageID 563. The next day, its staff decided to commit her to an in-patient psychiatric institution. Hoogland spent five days at this facility before its providers discharged her.

No. 21-5863, *Hoogland v. City of Maryville, Tenn., et al.*

Hoogland brought federal and state claims against Blount County and its officers (Corporal Gallow and Deputies Beckman, Pierce, and Weeden) and the City of Maryville and its officers (Sergeant Spicer, Corporal Riffle, and Officer Watson). The district court granted summary judgment to the city and to the individual officers on the federal claims. *Hoogland v. City of Maryville*, 2021 WL 3610459, at *1–13 (E.D. Tenn. Aug. 13, 2021). The court also granted the county's motion to dismiss the complaint on the federal claims. *Id.* at *13–14. It lastly declined to exercise supplemental jurisdiction over the state claims. *Id.* at *14. We review the court's decision on the federal claims de novo. *See Gambrel v. Knox County*, 25 F.4th 391, 399 (6th Cir. 2022); *Rudd v. City of Norton Shores*, 977 F.3d 503, 511 (6th Cir. 2020).

II

Hoogland raises five claims. She argues that: (1) Deputies Beckman and Weeden used excessive force; (2) Blount County failed to train these deputies; (3) Corporal Riffle unreasonably searched her; (4) Sergeant Spicer, Corporal Riffle, and Officer Watson violated our "state-created-danger" doctrine; and (5) Officer Watson interfered with her relationship with her daughter.

1. *Excessive Force*. Hoogland first asserts that Deputies Beckman and Weeden used excessive force when taking her into custody. The Fourth Amendment's ban on "unreasonable" "seizures" (which applies to the states by reason of the Fourteenth Amendment) typically regulates the arrest of suspects for crimes. U.S. Const. amend. IV; *United States v. Watson*, 423 U.S. 411, 415–24 (1976). But it also applies when officers seek to detain people for mental-health treatment out of concern that they may harm themselves or others. *See Machan v. Olney*, 958 F.3d 1212, 1214 (6th Cir. 2020); *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997). To detain a person on that ground, officers must have probable cause that the person might engage in harmful behavior. *Compare Rudolph v. Babinec*, 939 F.3d 742, 747–50 (6th Cir. 2019) (per curiam), *with*

7

No. 21-5863, *Hoogland v. City of Maryville, Tenn., et al.*

*Zucker v. City of Farmington Hills*, 643 F. App'x 555, 563–65 (6th Cir. 2016). Hoogland does not dispute that probable cause existed here in light of her emails.

Yet the Fourth Amendment also regulates the way in which officers effect such a detention. They may not use excessive ("unreasonable") force to take people into custody ("seiz[e]" "their persons"). U.S. Const. amend. IV; *Graham v. Connor*, 490 U.S. 386, 394 (1989). This limit applies no matter the reason for a seizure—whether to make an arrest or detain for treatment. *See Monday*, 118 F.3d at 1104. To distinguish legitimate from excessive force, courts consider the totality of the circumstances from the objective perspective of a reasonable officer. *See Graham*, 490 U.S. at 396–97; *Gambrel*, 25 F.4th at 400. Relevant questions include whether a reasonable officer could have believed that a person posed an "immediate threat" or was "actively resisting" being taken into custody. *Zucker*, 643 F. App'x at 568 (quoting *Graham*, 490 U.S. at 396).

We have repeatedly applied these rules in this case's context. Under our cases, officers may use significant force to gain control of mentally unstable individuals who may pose a threat to themselves or others, but they may not use gratuitous force against such individuals if they have not resisted. In one case, for example, an unstable man's daughter contacted the police after she found him with a gun. *Zucker*, 643 F. App'x at 557–58. When officers arrived at the man's apartment door, they asked him to accompany them to the hospital. *Id.* at 558. But the man turned to reenter his apartment and reached for his pocket, so an officer grabbed the man's arm, brought him to the ground, and struggled with him on the floor. *Id.* Another officer tased him. *Id.*; *see id.* at 566–68. On these facts, we held that the officers acted reasonably to control a dangerous situation involving a firearm. *Id.* at 568–70; *see also Caie v. West Bloomfield Township*, 485 F. App'x 92, 96–97 (6th Cir. 2012); *Monday*, 118 F.3d at 1104–05. In another case, by

No. 21-5863, *Hoogland v. City of Maryville, Tenn., et al.*

contrast, officers detained a nonresistant woman whom they unreasonably thought to be suicidal. *Rudolph*, 939 F.3d at 746. We held that they would have violated the Fourth Amendment if, as the woman claimed, they had "slammed" her into a wall, "dragged" her down a driveway, and caused her to need "multiple surgeries." *Id.* at 752; *cf. Folks v. Petitt*, 676 F. App'x 567, 570–72 (6th Cir. 2017).

Under this precedent, Hoogland argues, Deputies Weeden and Beckman used excessive force by aggressively pulling her out of her car and placing her in handcuffs. Our disagreement with her claim begins with a legal point: officers who conduct seizures usually may rely on secondhand information passed on by colleagues. *See United States v. Hensley*, 469 U.S. 221, 231–32 (1985); *Bey v. Falk*, 946 F.3d 304, 316–17 (6th Cir. 2019). And here, even before the deputies approached Hoogland's car, they had learned a lot of troubling things about her from their fellow officers with the City of Maryville. They had received reports that Hoogland was "armed" and that the gun that was "supposed to be in [her] house [was] missing." Riffle Body Cam., R.51-7, 0:59:44, 1:13:13–15. They had learned that Hoogland had been sending "twisted and warped" emails, *id.*, 1:13:24–26, and that she might be "homicidal and suicidal," Watson Body Cam., R.51-8, 1:17:52–54. They thus had been warned to "be careful" and "use extreme caution." Riffle Body Cam., R.51-7, 1:14:10, 1:16:20; Watson Body Cam., R.51-8, 1:17:38–40. With this information, they had a reasonable basis to think that they were confronting an armed, unstable person who might use a gun. *See Zucker*, 643 F. App'x at 568–69. Contrary to Hoogland's claim, she posed a far greater risk to officers (and to herself) than an ordinary driver stopped for a "routine" traffic violation. *Folks*, 676 F. App'x at 570.

The encounter also did not become any less concerning when the deputies approached Hoogland's car. They repeatedly yelled at her to get her hands up. According to the deputies,

9

Hoogland did not comply. Although she momentarily put her hands up, she began to place them between the steering wheel and, more concerningly, her lap. Notably, moreover, Hoogland points us to no contrary evidence. *Cf. Zucker*, 643 F. App'x at 566–67. At this point, then, a reasonable officer could have thought that Hoogland was reaching for a gun.

From there, the deputies could have reasonably concluded that they needed to quickly gain control of Hoogland and to separate her from any dangerous weapon. So Deputy Beckman applied an "arm-bar technique" to immediately immobilize her arm. Police Rep., R.64-1, PageID 710. A cruiser's dash-camera video next shows that Beckman and Weeden aggressively lifted her out of the car, pushed her against its side, and pulled her arms behind her back to handcuff her—actions completed in less than ten seconds. Weeden Dash Cam., R.51-11, 0:14:03–12; *cf. Caie*, 485 F. App'x at 96–97. Based on the deputies' reasonable belief that Hoogland had a gun and was "capable of violence," they reasonably used the force required to immobilize Hoogland quickly and "avoid the possibility that [s]he would retrieve the weapon[.]" *Zucker*, 643 F. App'x at 568–69 (citation omitted).

Hoogland responds that the video does not show her actively resisting before the deputies forcibly removed her from the car and handcuffed her. That is true. But she had flouted the deputies' commands to get her hands in the air. That type of noncompliance—when combined with the objective threat of a gun—justified the force required to incapacitate her. *See id.*; *cf. Caie*, 485 F. App'x at 97; *Monday*, 118 F.3d at 1104–05. The deputies did not need to give Hoogland the time to choose between leaving the car or brandishing a gun before "intervening to bring the situation under control[.]" *Lindsay v. Bogle*, 92 F. App'x 165, 170 (6th Cir. 2004).

2. *Failure to Train*. Hoogland next alleges that Blount County had a policy of improperly training its deputies and that this policy led Beckman and Weeden to use excessive force.

No. 21-5863, *Hoogland v. City of Maryville, Tenn., et al.*

The district court granted the county's motion to dismiss this claim on procedural and substantive grounds. Procedurally, it held that Hoogland forfeited the claim by failing to respond to the county's motion. *Hoogland*, 2021 WL 3610459, at *13. Hoogland objects that she had moved to strike the county's motion on the ground that it did not follow the court's meet-and-confer rules. And the county itself seems to have blatantly disregarded basic procedural rules by filing a motion to dismiss over a year after it had already filed an answer. Fed. R. Civ. P. 12(b).

Regardless, we need not consider these procedural issues because Hoogland's claim must fail on its merits. A party generally may hold a local government liable for the unconstitutional conduct of its agents under 42 U.S.C. § 1983 only if the party shows that the conduct resulted from a government policy or custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694–95 (1978). A municipality's failure to train its officers about the proper use of force can provide one way to prove this policy-or-custom element. *See Gambrel*, 25 F.4th at 408–09. But a general policy of failing to train officers cannot establish a municipality's liability if no officer subjected the particular plaintiff to unconstitutional action in the specific case. *See Dibrell v. City of Knoxville*, 984 F.3d 1156, 1165 (6th Cir. 2021). And none of the deputies here used excessive force. Without a constitutional violation, Hoogland cannot hold Blount County liable for any broader training deficiencies. *See id.*

3. *Unreasonable Search*. With no claims left against the county or its deputies, Hoogland shifts focus to the City of Maryville's officers. She argues that Corporal Riffle violated the Fourth Amendment's ban on "unreasonable searches" by patting her down for a firearm after the deputies detained her. Ever since *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court has held that the Fourth Amendment permits officers to "stop and frisk" suspects if they have "reasonable suspicion" that the suspects are engaging in crimes and are armed with weapons. *See Arizona v.*

No. 21-5863, *Hoogland v. City of Maryville, Tenn., et al.*

*Johnson*, 555 U.S. 323, 326–27 (2009). Here, everyone agrees that the officers had reasonable suspicion—indeed, probable cause—to detain ("stop") Hoogland. The parties instead debate whether Riffle had reasonable suspicion to pat down ("frisk") Hoogland for weapons.

At the outset, why should *Terry* supply the governing legal rules on these facts? Perhaps it sets the bar too low. The officers were conducting a welfare check; they were not investigating *criminal* activity. And at least one of our decisions has suggested that the normal probable-cause test—not *Terry*'s reasonable-suspicion test—governs investigative detentions in this mental-health context. *See Fisher v. Harden*, 398 F.3d 837, 842–43 (6th Cir. 2005). Or perhaps *Terry* sets the bar too high. The Supreme Court has long held that officers may *automatically* search people when taking them into custody as an incident to their arrest for a crime. *See Riley v. California*, 573 U.S. 373, 382–85 (2014). This search-incident-to-arrest rule might apply to arrests based on probable cause that an individual is dangerous and needs a mental-health evaluation. *Cf. Meehan v. Thompson*, 763 F.3d 936, 946 (8th Cir. 2014). At day's end, we merely highlight this issue so that our opinion is not taken to have resolved it. Given the parties' shared understanding on appeal, we simply assume that the reasonable-suspicion test applied to Riffle's search.

*Terry*'s reasonable-suspicion test required Riffle to have "a particularized and objective basis" to believe that Hoogland possessed a gun under the totality of the circumstances. *United States v. Sheckles*, 996 F.3d 330, 343 (6th Cir. 2021) (citation omitted). And the totality of the circumstances gave Riffle compelling grounds to believe that Hoogland was armed. Her daughter had said that Hoogland owned a gun but that it was missing from their home. Riffle also conducted a walk-through of the home and did not see it. And Hoogland's email implied that she was armed because it indicated that she had a bag with an "Arsenal" and "everything to exit 'life[.]'" Email,

12

No. 21-5863, *Hoogland v. City of Maryville, Tenn., et al.*

R.46-1, PageID 353. Yet the deputies had not found the gun in the car. So Riffle had "reason to believe that" Hoogland had the gun on her person instead. *Terry*, 392 U.S. at 27.

Hoogland resists this conclusion by poking holes in Riffle's investigation. Riffle only walked through Hoogland's home rather than search every drawer and closet. And Riffle failed to ask Hoogland's daughter where she normally kept the gun. Her daughter also used the hedge words "I think" when saying that Hoogland had a gun with her. Watson Body Cam., R.51-8, 0:02:10–13. But these arguments assume that the reasonable-suspicion test sets a "high bar." *Sheckles*, 996 F.3d at 343 (citation omitted). It does not. *Id.* And the facts that Riffle knew comfortably gave her a "particularized" reason (that is, a reason specific to Hoogland) and an "objective" reason (that is, a reason based on more than a subjective hunch) to believe that Hoogland had a gun. *Id.* (citation omitted).

4. *State-Created Danger.* Hoogland next asserts that Sergeant Spicer, Corporal Riffle, and Officer Watson violated substantive due process because they gave the deputies exaggerated information about her threat level and so wrongly "created" the "danger" that the deputies would use excessive force. This claim misunderstands our "state-created-danger" doctrine.

The Due Process Clause bars state actors from "depriv[ing]" people of their "liberty" unless they receive "due process of law[.]" U.S. Const. amend. XIV, § 1. Because this clause is written only as a limit on state action, it generally imposes no affirmative duty on state actors to protect people from crimes committed by other private parties. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197–200 (1989). Under our "state-created-danger" doctrine, however, we have read an exception into this rule that sometimes compels state protection from private violence when the state actor has a sufficient connection to the violence. *See Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 932 (6th Cir. 2020). To establish a state-

13

created-danger claim, a plaintiff must show, among other things, that the state actor took some "affirmative" step that increased the plaintiff's risk of harm from "private acts of violence." *Id.* (citation omitted).

This element shows the problem with Hoogland's argument. The deputies who caused the purported harm were *government*—not *private*—actors. And we have rejected requests to extend our state-created-danger doctrine to cover claims that one state actor should have protected a plaintiff from the harm caused by another state actor. *See Estate of Barnwell by S.C.B. v. Grigsby*, 681 F. App'x 435, 443 (6th Cir. 2017); *Peete v. Metro. Gov't of Nashville & Davidson Cnty.*, 486 F.3d 217, 223 (6th Cir. 2007); *see also Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 927–28 (10th Cir. 2012). That makes good sense. When the harm-producing parties are themselves state actors, the plaintiff may hold those actors directly liable—as Hoogland tried to do by raising excessive-force claims against the deputies. *See Gray*, 672 F.3d at 928. And the Supreme Court has repeatedly made clear that we should avoid creating novel and amorphous "substantive due process" claims whenever another constitutional provision specifically regulates the conduct at issue. *See Conn v. Gabbert*, 526 U.S. 286, 293 (1999) (quoting *Graham*, 490 U.S. at 395).

This conclusion does not necessarily mean that the other state actors are off the hook. Although § 1983 does not allow the plaintiff to hold one party vicariously liable for another's conduct, *Pineda v. Hamilton County*, 977 F.3d 483, 490 (6th Cir. 2020), state actors can be liable for their own conduct. And officers who do not directly seize a person may sometimes violate the Fourth Amendment if they pass along false information to the officers who engage in the seizure and who rely on the false information when doing so. *See Bey*, 946 F.3d at 312–15. Officers also can be liable for each other's acts if they enter into a conspiratorial agreement. *See Rudd*, 977 F.3d at 512–13. But Hoogland asserts no such theories here, so we need not consider their viability.

14

No. 21-5863, *Hoogland v. City of Maryville, Tenn., et al.*

In response to this problem that a private party did not cause her harm, Hoogland shifts gears on appeal by suggesting that the city officers increased the risk that Blount Memorial Hospital would detain her against her will. But she forfeited this argument by failing to raise it in the district court. *See Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). Besides, she points to no evidence that the hospital or its employees were private (instead of public) actors. *Cf. Sanders v. Traver*, 2002 WL 1298769, at *1–2 (Tenn. Ct. App. June 12, 2002). Her failure to identify a private actor dooms this claim.

5. *Interference with Parent-Child Relationship*. Hoogland lastly argues that Officer Watson unconstitutionally interfered with her custody of her daughter. Video from Watson's body camera recorded him consoling Hoogland's daughter before he left the scene. He told her that "the best thing that is going to happen is that when you turn 18 you're able to jet." Watson Body Cam., R.51-8, 1:24:20–23. He added that it was his "advice not to let [Hoogland] know what you plan on doing" and to "just up and do it one day"—"let it be a total surprise and leave." *Id.*, 1:24:52–25:04. This speech, Hoogland claims, violated her substantive-due-process rights.

Hoogland is correct that the Supreme Court has held that parents have a fundamental liberty interest in the custody and upbringing of their children. *See Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (plurality opinion); *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981). But it is not enough for Hoogland to point to a liberty interest. She must show that a state actor "deprive[d]" her of this interest—as the Due Process Clause's text requires. U.S. Const. amend. XIV, § 1; *DeShaney*, 489 U.S. at 194–96; *see also Lyng v. Castillo*, 477 U.S. 635, 638 (1986). Most plaintiffs asserting these claims have no problem showing a deprivation because they allege that a state has used its coercive power to physically limit their custody. *See Schulkers v. Kammer*,

15

No. 21-5863, *Hoogland v. City of Maryville, Tenn., et al.*

955 F.3d 520, 540–42 (6th Cir. 2020); *Siefert v. Hamilton County*, 951 F.3d 753, 757–59, 766–67 (6th Cir. 2020).

    Here, however, Hoogland's claim fails because Watson's conversation with her daughter did not "deprive" her of anything. Indeed, we have already held that an even more invasive child-abuse investigation does not deprive parents of their fundamental parental rights if it does not result in any limit on their custody or control. *See Kottmyer v. Maas*, 436 F.3d 684, 691 (6th Cir. 2006). And Hoogland has failed to show that Watson's speech led to any state-sanctioned deprivation of her rights to the custody or care of her daughter. In fact, Hoogland does not dispute that, as Watson explained to her daughter, any power to remove her from Hoogland's custody rested with the Tennessee Department of Children's Services, not with the police. *Cf. Pittman v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 640 F.3d 716, 729 (6th Cir. 2011). Because Hoogland has failed to show that Watson deprived her of any fundamental parental right, Hoogland's claim lacks merit.

    We affirm.

16

Case 3:19-cv-00383-TAV-DCP    Document 97    Filed 06/02/22    Page 18 of 19    PageID #: 1041

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 21-5863

THERESA HOOGLAND,

    Plaintiff - Appellant,

v.

CITY OF MARYVILLE, TENNESSEE, a governmental entity; MATTHEW WATSON, Individually; ELIZABETH RIFFLE, Individually; SCOTT SPICER, Individually; HAROLD WEEDEN, Individually; DARIN G. GALLOW, Individually; CHRISTOPHER J. PIERCE, Individually; DEPUTY JUSTIN BECKMAN, Individually; BLOUNT COUNTY, TENNESSEE, a governmental entity; JOHN AND JANE DOES, 1–10,

    Defendants - Appellees.

**FILED**
Jun 01, 2022
DEBORAH S. HUNT, Clerk

Before: SUTTON, Chief Judge; KETHLEDGE, and MURPHY, Circuit Judges.

## JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.

    THIS CAUSE was heard on the record from the district court and was submitted on the briefs without oral argument.

    IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

                                **ENTERED BY ORDER OF THE COURT**

                                Deborah S. Hunt, Clerk